UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION


**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**                                         **PLAINTIFF**


**VERSUS**                              **CIVIL ACTION NO. 2:04cv322KS-JMR**


**AGRO DISTRIBUTORS, LLC,**
A Delaware Corporation                                              **DEFENDANT**


## MEMORANDUM OPINION AND ORDER

This matter is before the court on Motion for Summary Judgment **[#145]** filed on behalf of the defendant, Agro Distributors, LLC.  The court, having reviewed the motion, the response, the pleadings and exhibits on file, the briefs of counsel, the authorities cited, and being fully advised in the premises finds that the motion is well taken and should be granted.  The court specifically finds as follows:


## FACTUAL BACKGROUND

The Equal Employment Opportunity Commission ("EEOC") filed this suit to prosecute Agro Distribution, LLC ("Agro"), for its alleged violations of the Americans with Disabilities Act of 1990 ("ADA").  The EEOC asserts that Agro failed to reasonably accommodate Henry A. Velez ("Velez") and then discharged Velez because of his alleged disability.  According to the plaintiff, Velez was born with a physical impairment known as Anhidrotic Ectodermal Dysplasia ("Ectodermal Dysplasia" or "ED").

Ectodermal Dysplasia is a genetic defect which results in the abnormal development of skin and the absence of sweat glands in an individual. Individuals with this disorder frequently suffer from abnormal development of the teeth, thin ears, dry eyes and a foul smelling nasal discharge. According to *Stedman's Medical Dictionary*, the outward symptoms of Ectodermal Dysplasia include congenitally defective or absent sweat glands, smooth, finely wrinkled skin, sunken nose, malformed and missing teeth, sparse fragile hair, and associated with deformed nails, absent breast tissue, mental retardation, syndactyly; associated X-linked recessive inheritance.

According to Velez, he experiences difficulties doing manual labor in temperatures in excess of 80º Fahrenheit. In order to deal with these difficulties, Velez has learned a number of coping techniques. These included frequent breaks, standing in front of a fan and dousing himself with water. Velez testified that as long as he is afforded these accommodations, he generally can perform manual labor without difficulty.

Agro is a subsidiary of Agriliance, LLC, and owned by Land O' Lakes, Inc., of Minnesota. Agro's primary business is providing products to farmers such as seeds, fertilizers and crop protection products, as well as services associated with those products. Velez was originally hired as a truck driver by Agro at its Hattiesburg, Mississippi facility in February of 2000. At that time, Lonnie Savage was the manager of the Hattiesburg facility. Savage hired Velez at the recommendation of another Agro employee, Johnny Whitehead. Shortly thereafter, Wesley Graham became Agro's Hattiesburg location manager. However, soon after Velez was hired his mother-in-law began experiencing health problems, and Velez left the company to help take care of

her. In March of 2001, Agro rehired Velez in his former truck driving position.

In June of 2002, Graham left Agro Distribution as the result of a re-organization and was replaced by the area Sales Representative, Will Griffin. During the time that Graham and Griffin had worked together, Griffin allegedly made a derogatory comment about Velez when he and Griffin were once traveling thru the city of Sumrall, Mississippi, Velez' home town. Griffin told Graham that "This is the land of something hairs, nine hairs or something like that." Graham stated that Griffin then said, "Well, this is where Henry lives." Griffin does not deny that he made the derogatory statement to Graham about "nine hairs." Velez was allegedly the frequent butt of jokes told by Griffin including making the statement to Graham "that's what comes from inbreeding," in discussing Velez' appearance.

On July 15, 2002, Griffin ordered staff to report to work early the following day, July 16, 2002, in order to load empty barrels onto a trailer for shipment. This was a dirty job involving loading empty feed barrels that had been used to feed cattle in feedlots or pastures to return for reimbursement of a deposit. It was considered such an unsavory job that Griffin had instructed all but one non-office employee of the Hattiesburg facility, including himself, to assist in the loading job. The only employee excluded was a petite female. Griffin specifically scheduled the job at 6:00 A.M. so that the employees could get the task completed before it got too hot.

Velez had previously helped load less than a full trailer of barrels before in the warm temperatures and had allegedly become ill. Velez also testified that he had helped load a full trailer of these same type barrels twice, with only one person helping, when the weather was cooler and did not have a problem overheating or becoming ill.

After receiving word of the assignment to load the barrels, Velez talked to Agro manager Payne about the job assignment before he left work on the fifteenth. He was not relieved of assisting in the assignment so he called Griffin at home that night to discuss the assignment with him. Velez allegedly told Griffin that this type assignment had made him sick on one occasion and requested to be excluded. However, Velez has testified that he was "pissed off" that he was not excluded from the assignment. Griffin testified that Velez told him that he (Velez) should be exempted because he had previously done the job with the help of only one other person and that he should not be required to do it again until all other employees had. Griffin responded by telling Velez that if Velez did not help out he would "suffer the consequences."

The following morning, Velez did not report early to the job assignment nor did he report at his regularly assigned time. He later called in to see if he could make his usual deliveries. Velez spoke to the warehouse manager, Jeremy Payne, who told him he would have to talk to Griffin. When Velez spoke with Griffin, he was informed by Griffin that he was fired and should turn in his uniforms. The barrel loading job was completed in approximately two hours commencing at 6:00 A.M. The defendant has provided meteorological data that on the morning of July 16, 2002, the temperature for Hattiesburg did not exceed 70º before 8:00 A.M. and did not reach 80º until approximately 11:00 A.M.

After his termination, Velez applied for and received unemployment compensation benefits. During the time he was off work and receiving benefits, he was able to refinance his home. To facilitate that process, Velez has admitted that he falsified his application to indicate that he was driving a truck for Ward's, when, in fact,

4

he had no job. After his unemployment benefits expired, Velez applied for and accepted a position as mechanic at Canebrake Country Club. His duties include mowing the golf course, maintaining tractors, mowers and trucks. He also picks up and unloads chemicals, fertilizer and other supplies.

Velez filed a charge of discrimination with the EEOC on July 19, 2002. An investigator with the EEOC, LaQuida Small, was assigned to the case. She coded the file as "A2" within days of being assigned. This code means that the EEOC will likely determine that the case is one that will ultimately be charged.

Small visited the Agro facility in Hattiesburg on May 23, 2003, to conduct interviews with Agro personnel. Payne and Griffin have testified that Small was rude and seemed to have her mind made up as to the facts. They were so concerned about her attitude that they wrote a letter to EEOC Area Director Benjamin Bradley on the same day. They never received a response to the letter.

On June 17, 2003, Small issued her predetermination notice advising Agro of her intention to recommend a cause finding against Agro. Agro responded on July 3, requesting reconsideration of the proposed finding and pointing out several factual errors in Small's predetermination. The Commission did not respond to Agro's request and instead issued its "determination" on July 22, 2003, finding that "the evidence obtained during the investigation [ ] establishes a violation of the Americans with Disabilities Act (ADA)."

The determination letter of July 22 included a proposed "conciliation agreement" seeking full, make-whole relief including back pay, reinstatement and compensatory damages and demanded payment in excess of $156,000. Counsel for the defendant

5

alleges that Small was contacted by phone on several occasions in an effort to set a meeting to discuss conciliation and settlement of the dispute. However, the conciliation log maintained by Small contains no entries of such attempts. At Small's recommendation, the Commission terminated conciliation efforts on August 19, 2003. Counsel for Agro wrote Area Director Bradley on August 22, complaining that they had never received a response to their July 3 request for reconsideration and objecting to the closing of conciliation without any real attempt to resolve that matter on the part of the EEOC.

      On August 28, the EEOC withdrew the failure of conciliation letter but informed Agro that any counter-proposal would have to be consistent with the EEOC's make-whole "Remedies Policy." Agro's counsel requested clarification as to whether the make-whole requirement meant that settlement could not be reached unless there was a reinstatement and full payment of all back pay and compensatory damages. Agro also tendered a counter-offer of settlement even though it received no response from the EEOC to its requests for clarification. Ten months later, a regional attorney for the EEOC responded that the Commission would not entertain any settlement which did not include reinstatement, full back pay and some payment of compensatory damages. However, during the course of discovery in this litigation, the EEOC withdrew its demand for reinstatement and back pay and is now pursuing only a compensatory claim for emotional distress and punitive damages.

## **STANDARD OF REVIEW**

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).  The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment.  *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role.  *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986).  "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment.  The dispute must be genuine, and the facts must be material."  Id.  "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment."  *Phillips Oil Company v. OKC Corporation*, 812 F.2d

265, 272 (5th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323, 106 S.Ct at 2552." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992).

In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalian*, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John*, 757 F.2d at 708. "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion. *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v.*

*National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978).  In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact."  *In Re Municipal Bond Reporting Antitrust Lit.* , 672 F.2d 436, 440 (5th Cir. 1982).  To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda.  The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial.  Rule 56(e), Fed.R.Civ.P.  *See also, Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the] court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment.'"  *John*, 757 F.2d at 712 (*quoting Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

## REQUIREMENT FOR CONCILIATION

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(b) provides in pertinent part:

> If after investigation, the Commission determines there is reasonable cause to believe that the charge [of discrimination] is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practices by informal methods of conference, conciliation, and persuasion.

"To satisfy the statutory requirement of conciliation, the EEOC must (1) outline to the employer the reasonable cause for its belief that [the ADA] has been violated; (2)

offer an opportunity for voluntary compliance; and (3) respond in a reasonable and flexible manner to the reasonable attitudes of the employer." *E.EOC. v. Asplundh Tree Expert Co.*, 340 F.3d 1256,1259(11th Cir. 2003)(*citing EEOC v. Klingler Elec. Corp.*, 636 F.2d 104, 107 (5th Cir.1981)).

Conciliation is one of the "essential functions" of the EEOC. *EEOC v. Pet, Inc., Funsten Nut Div.*, 612 F.2d 1001, 1002 (5th Cir. 1980). The conciliation requirement "clearly reflects a strong congressional desire for out-of-court settlements of [ADA] violations." *Asplundh*, 340 F.3d at 1260 (*citing Culpepper v. Reynolds Metals Co.,* 421 F.2d 888 (5th Cir.1970)).

The EEOC appears to have issued an all-or-nothing proposal in this case based on faulty facts and did not "respond in a reasonable and flexible manner" to the entreaties by Agro to resolve this matter. It appears that the Commission dealt in an arbitrary manner based on preconceived notions of its investigator and ignored the attempts of Agro's counsel to engage the Commission in settlement discussions. As the Fifth Circuit has stated, "such an all or nothing approach on the part of a commission, one of whose most essential functions is to attempt conciliation, will not do." *EEOC v. Pet, Inc., Funsten Nut Div.*, 612 F.2d at 1002.

Even though the court concludes that it appears that the EEOC did not attempt conciliation in good faith, summary judgment is a harsh remedy. *See Klinger*, 636 F.3d at 107. However, the Commission's actions in this case border on the imposition of just such a harsh remedy. Nevertheless, the court will proceed to review the merits of the underlying ADA claim of Velez, which the court finds is dispositive.

## **THE AMERICANS WITH DISABILITIES ACT**

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Claims under the ADA follow the same burden shifting framework established in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253-54, 101 S. Ct. 1089, 1093, 94, 67 L.Ed.2d. 207 (1981). A plaintiff seeking redress through the ADA must first establish a prima facie case of disability discrimination. Once he or she does so, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment decision. If the employer does so, then the burden shifts back to the plaintiff to demonstrate that the reason proffered by the defendant is merely a pretext and that the true reason for the action is illegal discrimination. *Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955 (5th Cir. 1993). The ultimate burden of proving intentional discrimination remains with the plaintiff at all times. *Id.*

In order to establish a *prima facie* case of disability discrimination, the plaintiff must be able to establish the following:

    1)    he suffers from a disability as that term is defined by the ADA;
    2)    he is a qualified individual--i.e., he is capable of performing the essential functions of the job in question, with or without reasonable accommodation; and
    3)    he was terminated because of his disability.

*Pegues v. Emerson Electric Co.*, 913 F. Supp. 976, 979 (N.D. Miss. 1996).

The Fifth Circuit has held that the threshold requirement in any ADA claim is that

the EEOC, suing on behalf of an allegedly disabled person, must first establish that the person in fact has a disability. *de la Torres v. Bolger*, 781 F.2d 1134, 1136 (5th Cir. 1986).

The ADA defines a disability as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

"A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. The statute requires an impairment that substantially limits one or more of the major life activities." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995). Therefore, to survive summary judgment under this analysis, it is incumbent on the plaintiff to show a genuine issue of material fact as to whether Velez had a physical or mental impairment, and, if so, whether it substantially limited one or more of his major life activities. *See Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996).

Although the ADA does not define the terms "substantially limits" or "major life activities," regulations promulgated by the EEOC provide guidance. Title 29, § 1630.2(I) characterizes major life activities as functions including "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Dutcher* includes tasks such as lifting, reaching, sitting or standing. 53 F.3d at 726 n. 7. The EEOC regulations define "Substantially limits" as

>     (I)  Unable to perform a major life activity that the average person in the general population can perform; or
>     (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j).  Further, "[w]hether an impairment is substantially limiting depends on '(1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term impact.'" *Dupre v. Charter Behavioral Health Systems of Lafayette Inc.*, 242 F.3d 610, 614 (5th Cir. 2001)(quoting *Dutcher,* 53 F.3d at 726).

## ANALYSIS

The EEOC contends in its brief that Velez in limited in the major life activities of breathing and perspiring.  However, Velez, in deposition testimony, contends that his only life activity which has been substantially limited by his impairment is his ability to work.  The Fifth Circuit has determined that a limitation on ones' ability to work, in and of itself, is not sufficient to be considered as substantially limiting a major life activity.  *Dutcher*, 53 F.2d at 726, n. 7.  Regardless of how the plaintiff or Velez characterizes how his impairment limits his life activities, "[i]n order to prove that [Velez is] so limited, [the EEOC] is required to demonstrate that [Velez's impairment] preclude[s] [him] from a class of jobs or a broad range of jobs." *Dupre*, 242 F.3d at 614.  As the *Dupre* court went on to state

>     [t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.  If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded

>from a substantial class of jobs.  Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Id.*(citations and internal quotation marks omitted).

Velez's own work history and testimony precludes the court from finding that his impairment substantially limits any major life activity.  There is no direct medical evidence before the court that Velez has in fact been diagnosed with Ectodermal Dysplasia.  Velez testified that his grandmother told him he had no sweat glands and that his family physician told him the same at some time in years past.  The EEOC argues that the defendant's expert doctors, Dr. Hiatt and Dr. Shapiro have stated that Velez' appearance and symptoms are consistent with one suffering from the condition.  However, the EEOC has moved to strike both doctors' reports.  The doctors in fact state that while Velez' appearance and symptoms are consistent with one suffering from Ectodermal Dysplasia, one must undergo specific tests to determine the presence of the condition and the extent to which that particular person is affected.  There is no evidence that Velez has ever undergone this specific testing to be properly diagnosed.

Regardless of the foregoing, Velez has held various jobs which all required manual labor.  These include working in a automobile body shop and as a mechanic for more than fifteen years, one year offshore working twelve hour days of seven days on and seven days off, working for one to one and one-half years as a diesel mechanic, driving a gravel truck for a period of time and working for a logging company as a truck driver and saw hand.  All of these jobs preceded his work for Agro as a truck driver for approximately two years.  He has been employed as a mechanic, manual laborer for Canebrake since some time after his termination by Agro to the present time.  Clearly,

the foregoing demonstrates that Velez "'retains the ability to compete successfully with similarly skilled individuals' and that [he is] not therefore restricted from performing a broad range or class of jobs." *Dupre*, 242 F.3d at 615 (*quoting Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047, 1051 (5th Cir.1998)).

The court therefore finds, in light of the evidence presented by the EEOC regarding Velez, that no reasonable juror could conclude that Velez is substantially limited in one or more major life activity (or activities).  Accordingly, Velez is not disabled within the meaning of 42 U.S.C. § 12102(2)(A) and the defendant is entitled to summary judgment.

IT IS THEREFORE ORDERED AND ADJUDGED that the defendant's Motion for Summary Judgment **[#145]** is Granted and the plaintiff's complaint is dismissed with prejudice.

IT IS FURTHER ORDERED AND ADJUDGED that all other pending motions are dismissed as moot.  A separate judgment shall be entered herein in accordance with Rule 58, Federal Rules of Civil Procedure.

SO ORDERED AND ADJUDGED this the 27th day of July, 2006.


s/ *Keith Starrett*
UNITED STATES DISTRICT JUDGE